[Cite as *Pakeer v. Cleveland*, 2023-Ohio-4213.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

KIRANMAI PAKEER,                          :

    Plaintiff-Appellant,           :

                             No. 112489

    v.                             :

CITY OF CLEVELAND, ET AL.,                :

    Defendants-Appellees.          :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** November 22, 2023

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-22-959201

---

### *Appearances:*

Goldstein & Goldstein, L.L.C., Michael D. Goldstein, and
Kyle L. Crane, *for appellant*.

Mark D. Griffin, City of Cleveland Director of Law,
William Menzalora, Chief Assistant Director of Law, and
Affan Ali, and Michael J. Pike, Assistant Directors of Law,
*for appellees*.

---

SEAN C. GALLAGHER, J.:

{¶ 1} Kiranmai Pakeer appeals the trial court's decision granting summary

judgment in favor of the city of Cleveland and Angel Sampson-Hall (collectively "the

City") upon their assertion of political subdivision immunity under R.C. Chapter 2744 for a motor vehicle accident. For the following reasons, we reverse the decision of the trial court and remand for further proceedings.

{¶ 2} Pakeer was lawfully within the crosswalk at the intersection of East 21st Street and Chester Avenue when her foot was run over by one of the City's emergency medical services ("EMS") vehicles, an ambulance, which was driven by Sampson-Hall. The vehicle's front left tire crushed Pakeer's right foot, causing several fractures leading to the amputation of her big toe. Pakeer stated that she waited on the curb until the pedestrian walk signal activated before entering the street. The City does not dispute that. After viewing the walk signal, Pakeer took one or two steps before she was struck by the ambulance. Pakeer had no warning of the ambulance approaching from behind her vantage point.

{¶ 3} Before reaching the intersection, Sampson-Hall and her partner were responding to a 911 dispatch. At that time, they had no knowledge of the patient's condition. Upon arriving to assess and treat the patient, they determined that no emergency medical care or treatment services were required. They offered to transport that person to the hospital as a non-emergency transport. It is undisputed that the EMS vehicle's lights and sirens were not activated during that transport, and the crew believed themselves to be completing what they deemed to be a non-emergency transport. According to the police report that the City attempted to belatedly attach to its reply brief in support of the motion for summary judgment, the paramedic treating the patient told officers who responded to the accident with

Pakeer, that he was treating the patient for a "minor medical condition." After Sampson-Hall stopped to assist Pakeer, the individual being transported decided against continuing on with the EMS personnel, telling them: "I don't want to be transported by you guys. You all run people over."

{¶ 4} Sampson-Hall told police officers that she had been travelling westbound on Chester Avenue in completing the non-emergency transport. She intended to make a left-hand turn at the intersection. As she approached the intersection (with the intersection being defined by the parties as anything beyond the painted stop bar), the left-turn signal turned yellow from green. She believed the left-turn light would transition to red. Instead, the yellow left-turn arrow transitioned to a solid circular green light for the left-turning traffic. At her deposition, Sampson-Hall clarified her statement. She claimed that she was actually in the intersection and commencing her turn when the light transitioned to yellow, not just "approaching" it.

{¶ 5} The City is generally immune from liability based on the allegations advanced. That liability is removed if the plaintiffs can demonstrate the applicability of R.C. 2744.02(B)(1): "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority." Under that exception to the general grant of immunity, as is pertinent to the issues advanced in this appeal, a plaintiff must allege that the damages caused by the employee were a result of a negligent act of an employee.

*Garmback v. Cleveland*, 8th Dist. Cuyahoga No. 110295, 2022-Ohio-1490, ¶ 26, citing *Riveredge Dentistry Partnership v. Cleveland*, 8th Dist. Cuyahoga No. 110275, 2021-Ohio-3817, ¶ 32, *William v. Glouster*, 2012-Ohio-1283, 864 N.E.2d 102, ¶ 17 (4th Dist.), and *Gabel v. Miami E. School Bd.*, 169 Ohio App.3d 609, 2006-Ohio-5963, 864 N.E.2d 102, ¶ 39-40 (2d Dist.). The City does not dispute the applicability of R.C. 2744.02(B)(1) in general.

{¶ 6} Under division (B)(1), the City has additional defenses for emergency responders. It is a full defense to the liability established under division (B)(1), if the City can demonstrate that

> [a] member of an emergency medical service owned or operated by a political subdivision was operating a motor vehicle while responding to or completing a call for emergency medical care or treatment, the member was holding a valid commercial driver's license issued pursuant to Chapter 4506. or a driver's license issued pursuant to Chapter 4507. of the Revised Code, the operation of the vehicle did not constitute willful or wanton misconduct, and the operation complies with the precautions of section 4511.03 of the Revised Code.

R.C. 2744.02(B)(1)(c). An employee is individually immune from liability unless their "acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner." R.C. 2744.03(A)(6). Thus, the alleged existence of wanton misconduct forms the basis for liability as against both the political subdivision and its employee under the separate exceptions to immunity.

{¶ 7} Application of R.C. 2744.02(B)(1)(c), and any implications as to R.C. 2744.03(A)(6), form the crux of the parties' current dispute. According to the City, there are no genuine issues of material fact as to whether the EMS personnel

were completing a call for emergency medical services or whether Sampson-Hall's conduct constituted wanton misconduct. The trial court agreed with the City and concluded that there were no issues of material fact whether the defense to liability under R.C. 2744.02(B)(1)(c) applied, and as a result of that conclusion, the trial court granted judgment in favor of the defendants upon all claims.

{¶ 8} This court must conduct a de novo review of a trial court's decision overruling a motion for summary judgment in which a political subdivision or its employee seeks immunity. *Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 21. "If, after that review, only questions of law remain, the court of appeals may resolve the appeal. If a genuine issue of material fact remains, the court of appeals can remand the case to the trial court for further development of the facts necessary to resolve the immunity issue." *Id.*

{¶ 9} At the summary judgment stages, a plaintiff seeking to demonstrate the existence of an exception to immunity need not prove negligence or definitively disprove the defenses to liability under R.C. 2744.02(B)(1)(c). Typically, a plaintiff need only demonstrate a genuine issue of material fact as to whether the political subdivision employee, acting in the course and scope of their employment, was negligent in operating any motor vehicle. The burden is on the political subdivision and its employee to demonstrate the absence of a genuine issue of material fact with respect to the claims for immunity. In the present situation, the political subdivision must establish the absence of material fact as to the additional defense to liability for emergency responders if applicable. *Figueroa v. Greater Cleveland Regional*

*Transit Auth.*, 8th Dist. Cuyahoga No. 110069, 2021-Ohio-2268, ¶ 20-21; *Perlberg v. Cleveland*, 8th Dist. Cuyahoga No. 91913, 2009-Ohio-1788, ¶ 12.

{¶ 10} In this case, the City does not dispute that it is potentially liable under R.C. 2744.02(B)(1) for the motor vehicle accident the employee caused by failing to yield to the pedestrian who had the right of way to cross the street. The sole issue raised by the City is that it can establish the absence of a material issue of fact as to the defense to that liability for emergency medical services providers under R.C. 2744.02(B)(1)(c).[1] The City primarily relies on two claims: (1) that despite the undisputed fact that there was no emergency medical care or treatment being provided to the patient being transported on a non-emergency basis, Sampson-Hall was nonetheless "completing a call for emergency medical care or treatment"; and (2) that there was no evidence that Sampson-Hall's causing the collision with Pakeer constituted wanton misconduct because Pakeer walked in front of the turning ambulance. Pakeer agrees that these two elements of the (B)(1)(c) defense are the focus of this appeal, but argues the City is mistaken. We agree in part.

---

[1] The City cites R.C. 4765.49(B) as an additional basis to claim immunity for the motor vehicle accident. Under that provision, a political subdivision "is not liable in damages in a civil action for injury, death, or loss to person or property arising out of any actions" of EMS personnel "unless *the services* are provided in a manner that constitutes willful or wanton misconduct." (Emphasis added.) The City's reliance on R.C. 4765.49(B) is not warranted in this case. Pakeer was not receiving services from EMS personnel. *See, e.g., Johnson v. Cleveland*, 194 Ohio App.3d 355, 2011-Ohio-2152, 956 N.E.2d 355, ¶ 19 (8th Dist.). That provision applies to patients of EMS personnel who are receiving medical treatment, and it does not broadly apply to all interactions with EMS personnel. The more specific provisions of R.C. 2744.02(B)(1), 2744.02(B)(1)(c), and 2744.03(A)(6) control the immunity question in this case.

{¶ 11} Before addressing the arguments, we note that the City incorrectly refers to the "emergency call" as forming the basis of the immunity under R.C. 744.02(B)(1)(c): according to the City, "[t]he plain language of R.C. 2744.02(B)(1)(c) states that an 'emergency call' includes 'completing' a call." Appellee Brief, p. 13. Contrary to that assertion, however, "emergency call" is a statutory term of art, defined as "a call to duty, including, but not limited to, communications from citizens, police dispatches, and personal observations by peace officers of inherently dangerous situations that demand an immediate response *on the part of a peace officer*." (Emphasis added.) R.C. 2744.01(A). "Emergency call" pertains to calls for emergency assistance from "peace officers." The City has not demonstrated that any provision of the Ohio Revised Code includes EMS personnel under the umbrella of "peace officers." *See, contra,* R.C. 2935.01; *State v. Mole*, 149 Ohio St.3d 215, 2016-Ohio-5124, 74 N.E.3d 368, ¶ 26, fn. 2.

{¶ 12} In addition, R.C. 2744.02(B)(1)(c) does not reference an "emergency call," but instead, discusses the potential for immunity when EMS personnel are "responding to or completing *a call* for emergency medical care or treatment." (Emphasis added.) The term "call" is not modified by the term "emergency," rather it is the phrase "medical care or treatment" that is so modified. As persnickety as it seems, we must caution against interposing statutory terms of art into other statutory provisions or analytical discussions.

{¶ 13} As to its first claim, the City solely relies on *Bostic v. Cleveland*, 8th Dist. Cuyahoga No. 79336, 2002 Ohio App. LEXIS 325 (Jan. 31, 2002), in which the

panel broadly interpreted the phrase "while responding to or completing a call for emergency medical care or treatment" to mean that EMS personnel are "completing a call for emergency medical care or treatment" when transporting patients on a non-emergency basis. In *Bostic*, EMS personnel were dispatched based on a general call for emergency assistance after a 16-year-old victim was allegedly assaulted. *Id.* at 2. Upon arriving at the scene, the EMS providers noted no observable injuries to the victim, who required no medical care or treatment, much less "emergency medical care or treatment." *Id.* The victim complained of pain, so the EMS personnel offered to transport the victim and her mother to the hospital as a non-emergency transport. *Id.* During the ride, the mother was injured when the ambulance abruptly stopped. *Id.* at 3. The plaintiff claimed that because there was no emergency medical care or treatment being provided, the EMS personnel were not "completing a call for emergency medical care or treatment" as contemplated under R.C. 2744.02(B)(1)(c).

{¶ 14} The panel disagreed, and broadly concluded that political subdivisions have a defense to liability applicable to EMS personnel responding to calls dispatched as an emergency response until the EMS provider returns to the station. *Id.* at 8. In other words, according to the panel, EMS providers responding to *and then* completing *that* call for emergency medical care or treatment qualify for the additional defense to immunity established under R.C. 2744.02(B)(1)(c). That reading of the statutory language, however, displaces the legislature's use of the disjunctive phrasing meant to describe two disparate situations and creates a single

defense to liability under subdivision (B)(1)(c), that it is a defense to liability if, in part, the EMS provider is responding to and completing the call for emergency medical care or treatment. This reading seemingly goes too far.

{¶ 15} The phrase "while responding to *or* completing a call for emergency medical care or treatment" is stated in the disjunctive. (Emphasis added.) R.C. 2744.02(B)(1)(c). "'[D]isjunctive' is defined as: '* * * pleading or marked *by mutually exclusive alternatives* joined by "or" * * *.'" (Emphasis added.) *State ex rel. Rear Door Bookstore v. Tenth Dist. Court of Appeals*, 63 Ohio St.3d 354, 361, 588 N.E.2d 116 (1992), citing *Webster's Third New International Dictionary* 651 (1986). "The Ohio Supreme Court has defined the word 'or' as: '* * * a function word indicating an alternative between different or unlike things.'" *Id.*, quoting *Pizza v. Sunset Fireworks Co.*, 25 Ohio St.3d 1, 4-5, 494 N.E.2d 1115 (1986). Thus, this provision of the defense to liability must be read as two separate alternatives: that it is a defense to the liability imposed for motor vehicle accidents caused by the negligence of an EMS employee if the accident occurs while they are "responding to a call for emergency medical care or treatment" *or* if it occurs when they are "completing a call for emergency medical care and treatment."

{¶ 16} Those two situations are meant in the alternative, not to be treated as one unifying exception. In *Perlberg*, 8th Dist. Cuyahoga No. 91913, 2009-Ohio-1788, ¶ 12, for example, the panel noted that EMS personnel's accident occurred while they were responding to the call for emergency medical care or treatment. This established the foundation of the exception to liability under

R.C. 2744.02(B)(1)(c) such that there was no need to analyze or discuss whether the EMS team was completing a call for emergency medical care or treatment when the accident occurred.

{¶ 17} Thus, there are two phases to an emergency medical provider's conduct that obviate the political subdivision's liability for a motor vehicle accident under R.C. 2744.02(B)(1)(c). A political subdivision may not be liable if the accident occurred while the EMS provider was (1) responding to the call for emergency medical care or treatment (driving to the scene); or then (2) completing a call for emergency medical care or treatment (providing emergency medical care or treatment during the subsequent transportation or transporting to a medical facility for emergency treatment).

{¶ 18} The burden is on the city to prove the existence of either exception depending on when the accident occurs, but under the broad proposition announced in *Bostic*, 2002 Ohio App. LEXIS 325, an EMS provider may assert the defense to liability solely if it is responding to a call for emergency medical care or treatment because the provider is actively "completing" that call until arriving back at its original station. According to the *Bostic* panel, until that initial response to the emergency is "complete," as in the EMS personnel return to base, the defense is valid based on the initial emergency call out. *Id.* That legal conclusion appears to be a broad overreading of the legislature's word choice. It gives no meaning to the disjunctive phrasing of the defense and reads the phrase "emergency medical care or treatment" from the statutory provision since *Bostic* concluded that the EMS

provider need not actually be providing emergency medical care or treatment to qualify for the R.C. 2744.02(B)(1)(c) defense to liability. The political subdivision is essentially immune from liability from the moment of dispatch until the ambulance arrives back at the station.

{¶ 19} In this case it could be argued that Sampson-Hall was not completing a call for emergency medical care and treatment. The EMS professionals determined, after responding to a 911 dispatch, that the patient being transported was not in need of emergency medical care or treatment. Under their stated protocols, the EMS personnel agreed to transport the patient on a non-emergency basis, and it was at that time that the accident with Pakeer occurred. The EMS personnel were not "completing a call for emergency medical care or treatment" at the time of the accident under the statutory parlance. The emergency had ended, when through the exercise of their judgment, the EMS professionals determined that no emergency medical care or treatment was necessary.

{¶ 20} Although they arguably "responded" to a call for emergency medical care and treatment through the 911 dispatch, the accident did not occur during that phase of travel. The accident occurred while they were completing a non-emergency transport and during a time when they were not providing emergency medical care or treatment according to the facts presented. The paramedic riding with the patient confirmed that they were only treating them for a "minor medical condition" during a non-emergency transport. *Bostic's* overly broad interpretation of R.C. 2744.01(B)(1)(c) injects meaning and phrasing into otherwise unambiguous

language: that completing a call for emergency medical care and treatment includes a situation in which the EMS is not providing emergency medical care or treatment.

{¶ 21} Notwithstanding, Pakeer has asked us to distinguish *Bostic* instead of revisiting it.[2] As it stands, *Bostic* controls on the legal question posed: EMS personnel are considered to be completing a call for emergency medical care and treatment throughout the entire time they are responding to a 911 dispatch, even if it is determined that the patient was not in need of emergency medical care or treatment. As one jurist commented, "it defies logic that the judiciary would designate as an emergency" that which was not deemed to be an emergency by the trained EMS personnel. *Fogle v. Bentleyville*, 8th Dist. Cuyahoga No. 88375, 2008-Ohio-3660, ¶ 62. Unfortunately, and as illogical as it seems, that is where the law currently stands in this district.

{¶ 22} This adherence to precedent, however, does not afford the City entitlement to summary judgment. The City is also required to demonstrate the absence of a material issue of fact as to whether Sampson-Hall's misconduct could be considered wanton, defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, paragraph one of the syllabus.

---

[2] Any decision to revisit *Bostic* would undoubtedly create a conflict that can only be resolved through this court's en banc process.

{¶ 23} Ohio law establishes a "preferential status" for the vehicle or pedestrian with the right-of-way, and that status determines the standard of care owed. *Johnson v. Greater Cleveland Regional Transit Auth.*, 2021-Ohio-938, 171 N.E.3d 422, ¶ 71 (8th Dist.), citing *Anderson v. Schmidt*, 8th Dist. Cuyahoga No. 99084, 2013-Ohio-3524, ¶ 22, and *Deming v. Osinski*, 21 Ohio App.2d 89, 255 N.E.2d 279 (11th Dist.1969), *aff'd,* 24 Ohio St.2d 179, 265 N.E.2d 554 (1970); *see also Pierce v. Vanbibber*, 4th Dist. Scioto No. 99 CA 2639, 2000 Ohio App. LEXIS 3210, 7 (June 30, 2000). "Right-of-way" is broadly defined as the "right of a * * * pedestrian to proceed uninterruptedly in a lawful manner in the direction in which * * * the individual is moving in preference to another vehicle, streetcar, trackless trolley, or pedestrian approaching from a different direction into * * * the individual's path." R.C. 4511.01(UU)(1). The person with the right of way "*bears no duty*" to yield, avoid, or even look for other drivers who violate that right of way. (Emphasis added.) *Ramos v. Kalfas*, 8th Dist. Cuyahoga No. 64806, 1994 Ohio App. LEXIS 2171, 17-18 (May 19, 1994), *see also Johnson* at *id.* Any driver of a vehicle or any pedestrian who is lawfully proceeding in their right of way "has the right to assume other drivers will obey any laws requiring them to yield the right of way and has no duty to watch for approaching vehicles that may threaten to violate the right of way." *Johnso*n, citing *Anderson* at ¶ 24; *McCullough v. Youngstown City School Dist.*, 2019-Ohio-3965, 145 N.E.3d 996, ¶ 46 (7th Dist.), *Lydic v. Earnest*, 7th Dist. Mahoning No. 02 CA 125, 2004-Ohio-3194, ¶ 25-34, and *Morris*

*v. Bloomgren*, 127 Ohio St. 147, 187 N.E. 2 (1933), paragraphs one and five of the syllabus.

{¶ 24} The City is attempting to dispute Pakeer's right of way, claiming that Pakeer just stepped out in front of the ambulance contrary to Cleveland Codified Ordinances 471.01(b), which provides that "[n]o pedestrian shall suddenly leave a curb or other place of safety and walk or run into the path of a vehicle, trackless trolley, or streetcar which is so close as to constitute an immediate hazard."[3] That provision, however, is not applicable in light of the timing of the traffic control lights at the E. 21st Street and Chester Avenue intersection. *See, e.g., Schmidt*, 8th Dist.

---

[3] The City does not discuss the interplay between that section and Cleveland Codified Ordinances 413.05, which expressly applies to "pedestrian control signals" and provides that "[a] steady walking person signal indication, which symbolizes 'walk,' means that a pedestrian facing the signal indication is permitted to start to cross the roadway in the direction of the signal indication, possibly in conflict with turning vehicles." There is an exception for situations in which the turning vehicle is already in the intersection when the light first changes, in which case the pedestrian does not possess the right of way. Although there is a legitimate question whether Sampson-Hall's vehicle was "in the intersection" at the time the pedestrian light signaled Pakeer to walk, or merely "approaching it" as she told the police officers at the scene, R.C. 4511.13(A)(1)(a)(i) also provides Pakeer with the absolute right of way as to any vehicle turning left facing a solid, circular green light as occurred in this case when construing the evidence in a light most favorable to Pakeer. Simply stated, the City has not demonstrated that Cleveland Codified Ordinances 413.05 is the controlling authority.

The City cites a single statutory section without reference to the myriad of controlling provisions. This court would have to impermissibly supplement the arguments and sua sponte discuss all potentially relevant provisions to fully address the City's argument. This is beyond an appellate court's role and responsibility. *State v. Quarterman*, 140 Ohio St.3d 464, 2014-Ohio-4034, 19 N.E.3d 900, ¶ 19, quoting *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, ¶ 78 (O'Donnell, J., concurring in part and dissenting in part). The City has waived its right to rely on any other statutory provisions that may be applicable to its argument by not timely advancing them under its burden to demonstrate entitlement to summary judgment. It suffices that Cleveland Codified Ordinances 413.05 does not control the outcome as a matter of law.

Cuyahoga No. 99084, 2013-Ohio-3524, at ¶ 36-39 (pedestrian established her right of way to cross the intersection after the "walk" light illuminated by entering the intersection and did not relinquish the right of way to the right-turning vehicle controlled by the circular green light).

{¶ 25} Pakeer presented evidence confirming the order of the varying pedestrian and traffic control lights at the intersection. Her expert crash reconstructionist, Henry Lipian, determined that the westbound traffic control for Chester Avenue projects a left turn indication in following order: a green turn arrow, followed by a yellow arrow, during which time the traffic signal for E. 21st Street pedestrians displays a "do not walk" pictogram. The yellow arrow is lit (or active) for three seconds. Approximately two seconds after the yellow left turn signal cycles off becoming a circular, green light, the pedestrian's "walk" signal illuminates. Thus, the total time from when the yellow turn arrow illuminates to when the "walk" signal illuminates is over five seconds. When the "walk" sign is illuminated for pedestrian traffic crossing E. 21st Street, the signal for Chester Avenue is a solid, circular green, indicating that westbound traffic on Chester Avenue desiring to turn left must yield to the right of way of both the oncoming traffic heading eastbound and any pedestrian crossing E. 21st Street.[4] R.C. 4511.13(A)(1)(a)(i) (motor vehicles "facing

---

[4] According to the police report the City belatedly attached to its reply brief in support of the motion for summary judgment, Pakeer's expert correctly noted the duration and sequence of the traffic control lights. However, the City proffered the police officer's report for the purpose of considering the officer's accident reconstruction analysis to counter Pakeer's expert. Notwithstanding the improper introduction of new material in a reply brief, *State ex rel. Evans v. Chambers-Smith*, 156 Ohio St.3d 430, 2019-Ohio-1335, 128 N.E.3d 213, ¶ 12, citing *In re Fuel Adjustment Clauses for Columbus*

a circular green signal indication are permitted" to turn left, but must yield to "[p]edestrians lawfully within an associated crosswalk"). Lipian also calculated Sampson-Hall's speed to be 28-31 m.p.h. on the surface streets with 25 m.p.h. posted speed limits.

{¶ 26} Pakeer's expert established some evidence that Sampson-Hall had not commenced her turn while the yellow left turn arrow was illuminated, which was corroborated by Sampson-Hall's statements to police officers responding to the accident that she was still approaching the intersection (placing her on Chester Avenue and not beyond the white stop bar) when the yellow-turn arrow first illuminated. According to that statement, Sampson-Hall was not in the intersection when the light transitioned. At her deposition, she claimed to be "in the middle of the intersection" when the arrow light turned yellow and that she had begun to turn through the intersection when the light changed to yellow. Her own statements create an issue of fact as to where the ambulance was positioned when the light transitioned.

{¶ 27} It is also undisputed that five seconds passed before the "walk" signal activated following the illumination of the yellow turn arrow that Sampson-Hall witnessed as she approached the intersection. Sampson-Hall maintained that she never stopped in the intersection despite her claim to have initiated the turn from

---

*S. Power Co. & Ohio Power Co.*, 140 Ohio St.3d 352, 2014-Ohio-3764, 18 N.E.3d 1157, ¶ 37, and presuming that the officer is qualified to render an opinion as to accident reconstruction analysis, the City has demonstrated disputed issues of expert opinions that can only be resolved by the trier of fact. The additional argument and evidence do not support the City's claim for summary judgment.

the middle of the intersection just before the yellow arrow illuminated. She claims to have slowed but kept moving in one continuous motion, and despite the five-second delay between the pedestrian light and the yellow arrow on Chester Avenue, Sampson-Hall still collided with Pakeer. Thus, there is an issue of fact as to the timing of the traffic lights as they relate to Sampson-Hall's travel.

{¶ 28} The pedestrian's "walk" signal illuminates five seconds after the Chester Avenue traffic control light for turning traffic illuminates the yellow arrow. The collision undisputedly occurred after the "walk" signal illuminated and Pakeer took one or two steps into the intersection (meaning additional time passed after the walk signal was illuminated). There is enough evidence, construing the disputed evidence in Pakeer's favor, demonstrating that she possessed the right of way to cross the street. *Schmidt*, 8th Dist. Cuyahoga No. 99084, 2013-Ohio-3524, at ¶ 36-39 (pedestrian established her right of way to cross the intersection after the "walk" light illuminated by entering the intersection and did not relinquish the right of way to the right-turning vehicle controlled by the circular green light). This impacts the nature of the duty owed.

{¶ 29} Construing the facts in favor of the nonmoving party, we cannot conclude that the City is entitled to a judgment as a matter of law. Sampson-Hall, who was turning left at the controlled intersection, was on a non-emergency transport that required her to obey all traffic control devices. She owed a duty as a matter of law to yield to Pakeer's right of way according to Pakeer's statement that the pedestrian "walk" signal had been illuminated before she took her one or two

steps into the street. Sampson-Hall failed to undertake any steps to prevent her collision with Pakeer. She did not audibly signal to anyone that she intended to invade the right of way of others by using her siren or horn. She did not attempt to slow or swerve. She simply continued through the turn without regard to the pedestrian at a time when the light controlling the intersection required her to yield.

{¶ 30} Wanton misconduct is defined as "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, at paragraph one of the syllabus. Sampson-Hall arguably failed to exercise any care toward Pakeer, who as a pedestrian with the right of way to cross the street was one to whom Sampson-Hall owed a duty of care. *See, e.g., Folmer v. Meigs Cty. Commrs.,* 4th Dist. Meigs No. 16CA17, 2018-Ohio-31, ¶ 27-28; *see also Kearns v. Meigs Cty. Emergency Med. Servs.*, 2017-Ohio-1354, 88 N.E.3d 438, ¶ 21 (4th Dist.). Beyond that, there is also evidence that Sampson-Hall was aware of a blind spot when turning left caused by her seating position and the large rearview mirror on the door of the ambulance. Approximately a year before striking Pakeer, Sampson-Hall collided with a parked police car while operating an ambulance and attempting to make a left turn. An ensuing accident investigation unit found her responsible for that event and revealed the blind spot to Sampson-Hall. Thus, Sampson-Hall was aware of her limited visibility turning left and even recognized that the blind spot obscured Pakeer immediately upon striking her with the ambulance.

{¶ 31} At the least, the City has not demonstrated the absence of genuine issues of material fact with respect to whether Sampson-Hall's operation of the vehicle constituted wanton misconduct for the purposes of R.C. 2744.02(B)(1)(c). That question is one for the jury to decide based on whose version of events is deemed more credible. As it stands, for the purposes of summary judgment, Pakeer established that she had the right of way to cross the intersection and Sampson-Hall failed to exercise any care toward Pakeer; she turned left through the intersection that required her to yield to pedestrians who were following the appropriate signals and knowing she had a large blind spot that would obscure those pedestrians. There is a genuine issue of material fact that remains, and as a result, the trier of fact must resolve that factual dispute necessary to rendering a decision on the immunity issue. The trial court erred in granting summary judgment in the City and Sampson-Hall's favor upon all claims.[5]

{¶ 32} The City and Sampson-Hall have failed to demonstrate the absence of genuine issues of material fact upon the question of their immunity from liability for the injuries sustained by Pakeer. Under R.C. 2744.02(B)(1), the City may be liable

---

[5] We recognize that the trial court granted summary judgment in favor of Sampson-Hall upon Pakeer's claims against her individually under R.C. 2744.03(A)(6). Under that provision, an employee of a political subdivision is not immune from liability when "(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities; or (b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) Civil liability is expressly imposed upon the employee by a section of the Revised Code." In light of the carryover between R.C. 2744.02(B)(1)(c) and our above discussion on the issues of fact surrounding the wanton misconduct, Sampson-Hall's individual claim for immunity presents the same factual issues necessitating a trial.

for the negligent operation of a motor vehicle by its employees unless the City can demonstrate, in part, that the operation of the vehicle *did not* constitute willful or wanton misconduct under subdivision (B)(1)(c).  In this case, Pakeer has presented some evidence upon which the trier of fact could reasonably conclude that Sampson-Hall's operation of the ambulance constituted wanton misconduct.  Summary judgment was not appropriate.

{¶ 33} The trial court's decision is reversed, and this matter is remanded for further proceedings.

It is ordered that appellant recover from appellees costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, JUDGE

MARY EILEEN KILBANE, P.J., and
MICHAEL JOHN RYAN, J., CONCUR